UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas Andrew GRIFFIN,
Defendant-Appellant.

No. 78–5093.

United States Court of Appeals,
Fifth Circuit.

Feb. 6, 1979.

---

Richard B. Bergstresser, Miami, Fla., for defendant-appellant.

Jack V. Eskenazi, U. S. Atty., Miami, Fla., James A. Hunolt, Atty., Crim. Div., App. Sec., Joseph S. Davies, Jr., Atty., Washington, D.C., for plaintiff-appellee.

Before WISDOM, GODBOLD and TJOFLAT, Circuit Judges.

WISDOM, Circuit Judge:

Thomas Griffin appeals his conviction under an indictment that charged him with "corruptly endeavor[ing] to obstruct the due administration of justice by testifying falsely" before a federal grand jury. In *United States v. Howard,* 5 Cir. 1978, 569 F.2d 1331, 1334, and *United States v. Partin,* 5 Cir. 1977, 552 F.2d 621, 631, *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189, we left open the question whether perjury by a witness can constitute an obstruction of justice punishable under 18 U.S.C. § 1503. The defendant objects on three grounds to the use of § 1503 to punish false testimony. He maintains first that the plain language of the statute covers obstructions of justice that result only from the actor's interferences with other witnesses, jurors, or court officials. Because § 1503 was originally enacted as a contempt statute, the defendant also argues that Congress did not intend the statute to cover simple perjury, an act not punishable summarily as contempt of court. Finally, Griffin urges that the statute would be unconstitutional if applied to this case because it does not give fair notice that it punishes false testimony. We reject these arguments and hold that the indictment states an offense under § 1503. Accordingly, we affirm the conviction.

I.

In September 1975, an Argentinian aircraft bound for Panama crashed at Miami International Airport. A bank bag containing $15,046 was discovered in the wreckage. In October the Federal Bureau of Investigation began to investigate whether the flight was connected to loansharking activities, including the transportation of money out of the country. The investigation soon focused on Charles "Bob" Ebeling and John Cifarelli, who were placed under electronic surveillance.

In January 1976, the FBI intercepted a number of conversations between the defendant Griffin and Ebeling. In these conversations, they discussed various ways to recover the money found in the crash. They also talked about a debt that Griffin owed Ebeling. Ebeling spoke of attempting to collect from a number of people indebted to him and said that he owed a substantial amount of money himself. The names of several individuals, including Jack, Dominick, and Angelo, figured prominently in the conversations. Although the FBI never identified these individuals, one name the defendant mentioned, Felix Herrerro, was identified as a passenger who died in the Miami crash.

On March 9, 1976, Griffin was called to testify before a grand jury investigating the financing of loansharking operations and the possible movement of money from the United States to South America. In response to questions concerning the crash, the debts, and the individuals mentioned in the conversations, Griffin either flatly denied knowledge or relied on an inability to recall the facts about which he was questioned. The following answers illustrate the nature of his testimony:

Q. What's your relationship with Bob, also known as Charles William Ebeling?

A. None, I just met him at the track and that's it. I don't even know his name.

Q. Do you know anything about a plane crash of a plane going to South America?

A. Know anything about? No, sir.

Q. Have you ever discussed with Mr. Ebeling, Bob, anything about a plane crash being on its way to South America?

A. Not that I can recall, with him.

.    .    .    .    .

Q. Do you know Felix Herrerro?

A. No, I do not. I know a Felix, but it is not Herrerro.

Q. Do you know an individual named Jack?

A. Jack?

Q. Yes.

A. Jack, not that I can recall. In regards to what?

Q. In regards to anything.

A. No.

Q. Did Mr. Ebeling ever tell you that if you didn't pay him the money you owed him you'd put him in the middle between him and some other people, put him in a bad spot?

A. I would put him in a bad spot?

Q. Yes, if you didn't pay him the money you owed him?

A. No.

Q. Do you know an individual named Dominick?

A. No, sir.

Q. Do you know anyone named Angelo?

A. No, sir.

Q. Do you know brothers named Dominick, Angelo?

A. No.

.    .    .    .    .

At his trial, Griffin testified that his grand jury testimony was true or innocently incorrect. He explained that he had fabricated the conversations about the money found in the airplane crash to avoid a joint financial venture proposed by Ebeling. Other conversations, Griffin said, were engineered by Ebeling to impress his wife. On December 6, 1977, the jury found Griffin guilty of obstructing justice. He was sentenced to 6 months imprisonment and 2 years probation.

## II.

A. Section 1503 is composed of two parts.[1] The first portion of the statute prohibits

1. Section 1503 provides:

"Whoever corruptly, or by threats or force, or by any threatening letter of communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000

the influencing, intimidation, or impeding of any witness, juror, or court official. The concluding clause of the statute penalizes anyone who "corruptly . . . endeavors to influence, obstruct, or impede, the due administration of justice". Relying on *ejusdem generis* and the principle that penal statutes must be strictly construed, the defendant argues that the concluding clause of the statute has no broader reach than the statute's specific language. Rather, the concluding clause makes clear that § 1503 prohibits any act that is similar in manner to intimidating witnesses and other court officials even though the act is not expressly described in the first part of the statute. The defendant urges us, therefore, to recognize a distinction between one who induces a witness to commit perjury, conduct which we expressly held forbidden by the concluding clause of § 1503 in *U. S. v. Partin*, 5 Cir. 1977, 552 F.2d 621, *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189, and one who perjures himself.

We have rejected similar reasoning raised by a defendant convicted under § 1503 for selling transcripts of secret grand jury testimony to persons under investigation. In *U. S. v. Howard*, 5 Cir. 1978, 569 F.2d 1331, 1333, we said that "we cannot agree with this reading of the statute because it renders the omnibus clause superfluous, *see United States v. Walasek*, 527 F.2d 676, 679 & n.11 (3d Cir. 1975), and because the most natural construction of the clause is that it prohibits acts that are *similar in result, rather than manner*, to the conduct described in the first part of the statute".[2] (Emphasis added by the court.) The issue before us now is, as it was in *Howard*, whether the defendant's conduct tended to obstruct justice. Is the effect of giving false testimony before a grand jury to prevent justice from being duly administered?

The clear implication of our analysis in *Partin* and *Howard* is that perjury constitutes an offense against the effective administration of justice. Although we left that question unanswered in *Partin*, we held there that one who conspired to induce a witness to testify falsely could be prosecuted under the omnibus clause of § 1503, not because the means chosen to obstruct justice violated the specific wording of the first part of the statute but because the object of the conspiracy was to obstruct justice. 552 F.2d at 631. In *Howard* we relied on *Partin* in holding that the omnibus clause aims at all conduct that results in an obstruction of justice. We explained further that using threats to prevent a grand jury witness from testifying has the result of destroying evidence. Although the accomplishment of this result by use of threats or bribes falls under the first clause, the destruction of evidence by the defendant alone comes under the omnibus clause. 569 F.2d at 1334.[3] Similarly, using threats or bribes to prevent a grand jury witness from testifying truthfully has the result of concealing and altering the nature of evidence. If such conduct constitutes an obstruction of the administration of justice, as we held in *Partin*,[4] then so does testifying falsely; the result in either case is the same.

The same conclusion was reached by the Court of Appeals for the Second Circuit in *U. S. v. Cohn*, 2 Cir. 1971, 452 F.2d 881, *cert.*

---

or imprisoned not more than five years, or both."

**2.** Other courts have applied *ejusdem generis* to section 1503, however, reading the omnibus clause in a manner similar to that suggested by the defendant. *See United States v. Ryan*, 9 Cir. 1972, 455 F.2d 728, 733; *United States v. Metcalf*, 9 Cir. 1970, 435 F.2d 754, 756–57; *United States v. Essex*, 6 Cir. 1969, 407 F.2d 214, 218.

**3.** Several courts have held that persons who destroy evidence relevant to judicial proceedings violate § 1503. *See, e. g., United States v.*

*Walasek*, 3 Cir. 1975, 527 F.2d 676; *United States v. Weiss*, 2 Cir. 1974, 491 F.2d 460, *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59.

**4.** Indeed, we defined the statutory term "administration of justice" as "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed." *United States v. Partin*, 5 Cir. 1977, 552 F.2d 621, 641, *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189; *United States v. Howard*, 5 Cir. 1978, 569 F.2d 1331, 1334 n.4.

*denied*, 1972, 405 U.S. 975, 92 S.Ct. 1196, 31 L.Ed.2d 249. Relying on the plain language of the statute, the *Cohn* court held that an obstruction of justice results when attempts to gather relevant evidence by a judicial body, which is charged by law with the task of investigating and punishing crime, are frustrated by the use of corrupt or false means. "The blatantly evasive witness achieves this effect as surely by erecting a screen of feigned forgetfulness as one who burns files or induces a potential witness to absent himself." 452 F.2d at 884.

The *Cohn* court, however, characterized the gist of the defendant's offense as the concealment of knowledge from the grand jury rather than the injection of falsehood into the proceedings. And the indictment charged Cohn with evasive as well as false testimony. Griffin reminds us that evasive testimony, which obstructs the system's administration of justice in a procedural way by blocking the grand jury investigation, must be distinguished from testimony which is false. Although perjury may distort the truth, the defendant contends that it does not impede the judicial process; the criminal system is in fact designed to deal with falsehood through cross-examination and other means. Because Griffin was charged with giving only false testimony, he insists that the indictment does not state an offense amounting to an obstruction of the administration of justice.

■ Our Court, however, has long recognized that the purpose of § 1503 is to protect not only the procedures of the criminal system but also the very goal of that system—to achieve justice. "The statute is one of the most important laws ever adopted. It is designed to protect witnesses in Federal courts and also to prevent a miscarriage of Justice." *Samples v. United States*, 5 Cir. 1941, 121 F.2d 263, 265, *cert. denied*, 314 U.S. 662, 62 S.Ct. 129, 86 L.Ed. 530. The perjurious witness can bring about a miscarriage of justice by imperiling the innocent or delaying the punishment of the guilty. Thus, had Griffin's testimony been merely false, it might well have come under the terms of the omnibus clause of § 1503, nonetheless. Such a case is not before us, however.

■ The defendant has ignored the actual nature of his testimony. We find it impossible to differentiate a flat refusal to testify from an evasive answer or a falsehood such as Griffin's: "No; I don't know; Not that I can recall". By falsely denying knowledge of events and individuals when questioned about them, Griffin hindered the grand jury's attempts to gather evidence of loansharking activities as effectively as if he refused to answer the questions at all. Whether Griffin's testimony is described in the indictment as "evasive" because he deliberately concealed knowledge or "false" because he blocked the flow of truthful information is immaterial. In either event, the government must, and in this case did, charge in the indictment and prove at trial that the testimony had the effect of impeding justice.

B. Griffin contends that our construction of the statute is contradicted by the legislative history. Section 1503 is derived from the Act of March 2, 1831, 4 Stat. 487. That act outlined the contempt jurisdiction of the United States courts. Section 1 of the 1831 Act, now 18 U.S.C. § 401, provided for summary punishment of contemptuous conduct in the presence of the court; section 2, the predecessor of § 1503, provided that contempts occurring outside the presence of the court would be punished after indictment subject to the safeguards of trial.[5] Because § 1503 was enacted as a federal criminal contempt statute, the defendant insists that it is necessary to determine whether the conduct charged as criminal under § 1503 amounts to contemptuous conduct. He points out that the Court of Appeals for the Sixth Circuit has relied on the

---

5. The history of the statute is outlined in Nelles & King, *Contempt by Publication in the United States*, 28 Colum.L.Rev. 401; 28 Colum.L.Rev. 525 (1928). *See also* Frankfurter and Landis, *Power of Congress Over Procedure in Criminal Contempt in "Inferior" Federal Courts—A Study in Separation of Powers*, 37 Harv.L.Rev. 1010 (1924); Goldfarb, *The History of the Contempt Power*, 1961 Wash.U.L.Q. 1.

rule that simple perjury cannot be punished summarily as contempt of court under 18 U.S.C. § 401 in holding that a person who files a false affidavit in an endeavor to secure a mistrial cannot be prosecuted under § 1503. *United States v. Essex*, 6 Cir. 1969, 407 F.2d 214.[6]

We disagree. In the first place, we find that the defendant's testimony in this case amounted to contemptuous conduct. Moreover, we doubt that the limitation on a federal judge's power to punish perjury summarily is also a limitation on the power to punish under § 1503.

Originally all false swearing was punishable summarily as criminal contempt in the federal courts.[7] *See, e. g., In re Schulman*, 2 Cir. 1910, 177 F. 191. In a series of decisions, however, the Supreme Court cautioned against the indiscriminate use of the contempt power to punish the perjurious witness. In *Ex parte Hudgings*, 1919, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656, a witness was held in contempt by the trial judge after he repeatedly asserted that he could not recall a certain event. The Court ordered relief, explaining that it hesitated to permit a court to impose summary punishment whenever it disbelieved a witness with the object of confining the witness until the court exacted from him a character of testimony which the court would deem to be truthful. 249 U.S. at 384, 39 S.Ct. 337. In a later decision, *In re Michael*, 1945, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30, the Supreme Court reviewed the propriety of a contempt citation imposed on a witness before the grand jury who answered willingly but whose testimony the trial judge disbelieved after hearing contradictory testimony by other witnesses. Justice Black wrote:

All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore it

cannot be denied that it tends to defeat the sole ultimate objective of a trial. It need not necessarily, however, obstruct or halt the judicial process. For the function of trial is to sift the truth from a mass of contradictory evidence, and to do so the fact finding tribunal must hear both truthful and false witnesses. 326 U.S. at 227–28, 66 S.Ct. at 80.

Undeniably, the Supreme Court found that perjury alone does not have a necessarily inherent obstructive effect on the administration of justice. The Court made clear, however, that false testimony can amount to contemptuous conduct when added to the element of perjury there is the " 'further element of obstruction to the Court in the performance of its duty' ". *In re Michael*, 326 U.S. at 228, 66 S.Ct. at 80, quoting *Ex parte Hudgings*, 249 U.S. at 383, 39 S.Ct. 337. As an example, the Court cited with approval a case where the requisite element of obstruction was found in sham inability to remember and blocking of the court's inquiry. *United States v. Appel*, S.D.N.Y.1913, 211 F. 495. *See also Schleier v. United States*, 2 Cir. 1934, 72 F.2d 414, cert. denied, 293 U.S. 607, 55 S.Ct. 123, 79 L.Ed. 697. *See generally* Dobbs, *Contempt of Court: A Survey*, 56 Corn.L.Rev. 183, 194–200 (1971). This additional element is present in the case before us. Griffin's testimony did not merely require the grand jury to ascertain the truth by resolving contradictory evidence; his denial of knowledge had the effect of closing off avenues of inquiry entirely.

Moreover, the range of conduct punishable under sections 1 and 2 of the 1831 Act was not identical. The critical distinction between the two sections was that summary contempt proceedings under section 1 left the determination of guilt to the judge rather than the jury. For this reason, the draftsmen intended that section 1 of the

---

6. The *Essex* court also departed from our construction of the omnibus clause of § 1503. 407 F.2d at 218. *See* note 2 *infra*.

7. Until 1906, however, the federal courts permitted the witness to invoke the privilege of purgation of contempt by oath and be punished

only for the crime of perjury, unless the contempt was clear on its face. *See United States v. Shipp*, 1906, 203 U.S. 563, 574, 27 S.Ct. 165, 51 L.Ed. 319; Curtis & Curtis, *The Story of a Notion in the Law of Criminal Contempt*, 41 Harv.L.Rev. 51 (1927).

Act embrace not only obstructions to the court that were not geographically remote but also more limited kinds of contempt than section 2. "The point [of section 2] was to provide for things not covered by section 1. Section 1 excluded from summary punishment certain misbehaviors which Justice Johnson had said there was inherent power to punish . . . There was no necessity, or even expediency that they be dealt with summarily." Nelles & King, *Contempt by Publication in the United States*, 28 Colum.L.Rev. 401; 28 Colum.L. Rev. 525, 531 (1928). Moreover, the Supreme Court cautioned that "[m]eticulous regard for those separate categories of offenses must be had, so that the instances where there is no right to jury trial will be narrowly restricted." *Nye v. United States*, 1941, 313 U.S. 33, 49, 61 S.Ct. 810, 816, 85 L.Ed. 1172.[8]

Indeed, in *In re Michael*, the Court explained that the issue whether ordinary perjury constitutes contemptuous conduct was to be resolved in the "constitutional setting" of summary contempt proceedings where the procedural safeguards of the Bill of Rights are lacking. 326 U.S. at 227, 66 S.Ct. 78. This concern for the absence of jury trial had prompted the Court, at first, to demand "an extraordinarily high standard of proof—roughly equivalent to the standard for directing a civil verdict" before the contempt power could be used, in place of the perjury statute, to punish false swearing. "But once having verbalized this high standard in terms of palpable certainty, courts then came to view the evidentiary

standard as a rule of substantive law. The early requirement that perjury must be 'apparent on its face' to be punishable as contempt became a rule that 'obstruction' . . . must be shown in addition to the perjury . . . ." Note, *Jury Trial for Criminal Contempts: Restoring Criminal Contempt Power and Protecting Defendant's Rights*, 65 Yale L.J. 846, 850–51 (1946).[9] There are no inroads on the defendant's procedural rights, however, when punishment is by way of § 1503.[10] We see no reason, therefore, to depart from the natural construction of the statute by reading the restrictive law of summary contempt into § 1503.

C. We also reject the argument that § 1503 does not give fair notice that it outlaws the defendant's conduct. The omnibus clause of the statute clearly states that it punishes all endeavors to obstruct the due administration of justice. Although that term covers a broad spectrum of conduct, it is not unconstitutionally vague. When the nature of the subject matter is a limitation upon the exactitude with which Congress can formulate a rule to cover the problem, Congress may use a term that conveys the type of conduct regulated rather than enumerate all the specific instances within the legislation. *Miller v. Strahl*, 1915, 239 U.S. 426, 434, 36 S.Ct. 147, 60 L.Ed. 364; *Baltimore Ohio R. R. v. ICC*, 1911, 221 U.S. 612, 620, 31 S.Ct. 621, 55 L.Ed. 878. The obstruction of justice statute was drafted with an eye to "the variety of corrupt methods by which the proper administration of justice may be impeded or

---

**8.** The Supreme Court's development of a jury trial right in non-petty criminal contempt cases since 1966, *see Cheff v. Schnackenberg*, 1966, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629; *Bloom v. Illinois*, 1968, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522, may erode this historical, judicial antipathy to the modern counterpart of § 1 of the Act, 18 U.S.C. § 401.

**9.** Viewing the Court's narrow construction of what constitutes an 'obstruction to the administration of justice' as limited to the summary contempt context makes sense in light of the common law's classification of the crime of perjury. At common law, the lying witness incurred legal penalties for his conduct even though his testimony did not cause injury to an

individual. His truthful testimony was owed to the government. Hence, the perjurer's crime was always viewed as one against the administration of justice. Perkins, Criminal Law, 382 (1957); Silving, *The Oath*, 68 Yale L.J. 1329, 1387–89 (1959).

**10.** At one time, the traditional perjury statute, 18 U.S.C. § 1621, offered more procedural protection than § 1503 since convictions for perjury required the testimony of two witnesses. The two-witness rule was eliminated in the federal courts in 1970, however. *See* 18 U.S.C. § 1623(e) (1970). *United States v. Koonce*, 8 Cir. 1973, 485 F.2d 374; *United States v. Ruggiero*, 2 Cir. 1973, 472 F.2d 599.

thwarted, a variety limited only by the imagination of the criminally inclined." *Anderson v. United States*, 6 Cir. 1954, 215 F.2d 84, *cert. denied*, 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 698.

Because of the breadth of the omnibus clause, however, it may not have been actually apparent to Griffin that his conduct would violate § 1503. Indeed, judicial opinions differ on whether false testimony is the type of conduct that constitutes an interference with the due administration of justice. But the requirement that statutes give fair notice cannot be used as a shield by one who is already bent on serious wrongdoing. *See United States v. Ragen*, 1942, 314 U.S. 513, 524, 62 S.Ct. 374, 86 L.Ed. 383; *United States v. Alford*, 1927, 274 U.S. 264, 267, 47 S.Ct. 597, 71 L.Ed. 1040; Note, *Due Process Requirements of Definiteness in Statutes*, 62 Harv.L.Rev. 77, 85 (1948). At the very least, Griffin must have known that witnesses before a grand jury proceeding are required to testify truthfully. There is little need of advance notice to a perjurer that his false testimony, which he well knows to be unlawful, is a violation of the law.

### III.

Turning finally to the record of the grand jury proceeding, we find that Griffin's false testimony was material because it had the natural effect of dissuading the grand jury from its investigation of alleged loansharking in Florida by Ebeling and others. The testimony need not be directed to the primary subject under investigation; it is material if it is relevant to any subsidiary issue or is capable of supplying a link to the main issue under consideration. *Barnes v. United States*, 5 Cir. 1967, 378 F.2d 646, 649, *cert. denied*, 1969, 390 U.S. 972, 88 S.Ct. 1056, 19 L.Ed.2d 1184; *Blackmon v. United States*, 5 Cir. 1940, 108 F.2d 572, 573–74. The questions concerning the airplane crash, the debt owed to Ebeling, and the persons mentioned in the monitored calls were either concerned with the subsidiary issue of transportation of money out of the country or were aimed at eliciting a link to the alleged loansharker.

The judgment of the district court is AFFIRMED.